Yes sir. May it please the court. I'm Jonathan Sternberg from Kansas City, Missouri and I represent the appellant Devion Williams. Mr. Williams appears appeals from a judgment sentencing him to 112 months in prison on one count of being a felon in possession of a firearm. This court should reverse that judgment because under the Fourth Amendment the district court should have suppressed that firearm which had been found in a red Dodge Challenger automobile that Mr. Williams was suspected of driving. In our briefs we explain that this is for two reasons and I'd like to begin by addressing the first. Mr. Sternberg, I have a threshold question. On what basis did Mr. Williams have a reasonable expectation of privacy in the red Challenger? It wasn't his car, was it? It was not his car. It belonged to an acquaintance. And is there any evidence in the That wasn't brought up one way or another, no. Mr. Williams did not testify at the suppression hearing. So does he have standing to raise these privacy issues? Yes, the government has never contested at all that the car in any way wasn't something that he had been driving. In fact, that's its entire case. He hadn't stolen the car but he had been driving it. There's no job to prove that if the government doesn't contest that. I understand standing is always an issue and this court obviously has a duty to address standing but if the government doesn't contest that then Mr. Williams has no duty to rebut that. That being said, the issue, the first issue that we have is the Fourth Amendment did not allow Kansas City Police Officer Justin Palmer to stop the red Challenger in the first place on his articulated notion that it had been stolen as he lacked a reasonable suspicion that it had been stolen. He testified that he... Didn't it have expired tags? It had a temporary tag which didn't show up when the police first ran it. That's correct. It had a temporary tag on it from Kansas. Wouldn't that be a reason to stop it? No, it would not because that wasn't what the articulated suspicion was. The articulated suspicion was that it was stolen and it wasn't... It didn't come from that. Instead, it came from officer... As Officer Palmer testified on page 14 of the transcript that he believed he had previously read that day from what they called the hot sheets. Well, would it be a reason... Would it be a legitimate reason to stop the vehicle? They did not know that it was an expired tag at the time, so no, it would not have been. The plates were run after the decision already had been made to stop the car. There's no evidence in the record that that was a reason that was ever used. So no, under this timing, that would not have been a reason to stop the car. The only reason that was ever given for stopping the car was that Officer Palmer testified he believed he previously had read that day from this hot sheet that a Dodge Challenger had been stolen from this dealership in Excelsior Springs. He also admits, though, that he pursued the red Challenger here without checking that hot sheet. He admitted on, again, page 14 of the transcript that he could have or radioing dispatch to see if this was so. And again, he could have. Either of which would have shown him that the red car actually reported stolen was a Dodge Charger, not a Dodge Challenger, which he admitted that in his experience as an officer in the Kansas City Police Department running the stolen car portion of the Police Department was a distinctly different automobile. The law of the United States is and must be that this was not an objectively reasonable mistake, which is what the magistrate judge found and the district judge found as well. His mere assumption wasn't really even a mistake at all. It's his subjectively reasonable. In Terry, the Supreme Court says that reasonable suspicion has to be, quote, more than an inchoate and unparticularized suspicion or hunch. In Cortez in 1981, it went on to define reasonable suspicion as a common-sense conclusion from articulable facts that reasonably raises suspicion that the subject was engaged in wrongdoing. Now certainly, as the government points out, and we certainly concede, sometimes officers may reasonably rely on incorrect information that a trustworthy third party has given them. On pages 16 and 17 of our reply brief, we go through the government's cases about this, the De Leon and Sparks cases, where an officer radios in the correct license plate, the dispatcher mishears it, resulting in a stolen vehicle report, and of course the officer can reasonably rely on that because that's, you know, he has no way of knowing that that's not an accurate report. But a belief drawn purely from the officer's own failure is not objectively reasonable because there isn't reasonable reliance. The government concedes this. On page 31 of its brief, it agrees that where, quote, an officer either knew or should have known of his mistake, the mistake is not objectively reasonable. As in the Maresca and Phelan cases, and to some extent the Jackson case, Maresca's from the 10th Circuit in 2015, Phelan's from the 7th Circuit in 2008, Jackson's from the 6th Circuit, suspicion to stop a particular car as determined from information immediately available to him that the car in the report is not the one he was pursuing. And that's exactly what occurred here. Under Cortez's standard, it makes sense that this would not be a reasonable suspicion because the officer's own failure isn't a common-sense conclusion from articulable facts that reasonably raises suspicion. It's simply his blunder. He messed up. Here, Officer Palmer's belief that the red Challenger was let alone an objectively reasonable one. Instead, he failed to check resources immediately available to him. The hot sheets that he had in hand, and we know he had them in hand because he admitted it. He also had used them earlier that day to determine that the purple Challenger that was initially seen was indeed stolen because it was on that hot sheet. And this goes to an interesting point. The magistrate judge, for the first time ever in this case, and then the used in the hot sheets. That CHR for Charger and CHL for Challenger and CHA for Charger. Officer Palmer, though, testified specifically that while he didn't remember exactly which one was which on the day of the hearing, that's on page 20 of the transcript, on the day that this occurred, that this incident occurred, he absolutely did know, and it's on page 21, he says because he had determined from it that the purple Challenger had been stolen. So, just so I understand, there's... Yes, sir. The hot sheet indicates that a purple Challenger had been stolen and a red Charger from the same dealer, right? That's correct. Were there other cars from the same dealer stolen? There were. In one of the exhibits that is in the exhibit packet I provided to the court, there's a list of what other automobiles from the Dodge dealership were stolen. So, he locates the purple Dodge Challenger. Correct. Which everybody concedes was stolen. Correct. And then the Dodge, the red Dodge Challenger pulls up and he, according to the magistrate judge, mistakenly thinks that's the red Dodge Charger. He thinks that earlier that day he had read that a Dodge Challenger had been stolen when in fact it was a Charger. But that's not his testimony, is the problem. His testimony was that he just thought he had read earlier that day that a red Challenger had been stolen. He said on page 14 of the transcript, he's asked, could you radio dispatch to determine whether, you know, this was so. He goes, yes, and then he volunteers. I also didn't recheck the hot sheet when the report of the red Challenger came in. That's the problem, and that's why this case is just like Maresca and Phelan. In Maresca and Phelan, an officer has a report in front of them that a particular car is stolen and suspects that the car that they're following and ultimately stopping is stolen, but they don't pay attention to the rest of the report. And I think in Phelan, it's from the Seventh Circuit, the officer punches in the plate, mistypes the plate number for a Cadillac that he's following, and it But in reality, the rest of the report said what was actually stolen, because he had mistyped this, was a black motorcycle. And of course, anyone would know that it's not the same thing. Had Officer Palmer radio dispatched, as he admits, had he looked at the hot sheets again, as he admits, he would have seen that this wasn't stolen. It's the same thing. I'd like to move briefly. So you say that a mistaken belief that's reasonable is not sufficient to support the stop? A mistaken belief, if it were a reasonable... The officer made a mistake. He made a mistake. The officer's own failure, when it's his own failure based on information directly in front of him, I mean, no, it's not. That isn't reasonable. In Maresca, the Tenth Circuit in 2015, the officer's, quote, failure to use readily available information already on the screen in front of her and from the dispatcher to verify that the vehicle was reported stolen was unreasonable. That is not a reasonable mistake, because it's the officer's own failing, not reasonable reliance on trustworthy information obtained from different parties, kind of like, you know, well, I'll leave it at that. I'd like to move to the second issue, which is more about timing than anything else, and that's that the Fourth Amendment also, separately, didn't allow Officer Warner Stumpenhaus to continue to detain Mr. Williams when, by his own admission, he no longer suspected the Red Challenger was stolen after running its VIN, which occurred at least, as he said, minutes before any contraband was found, and admittedly was the only reason for the stop. Now, in its brief, the government says, well, you know, they didn't really allay their belief on running the VIN that the car had been stolen, but that's not Officer Stumpenhaus' testimony. He testifies directly on page 58 to 60. There's a couple of exchanges that, once the VIN was run, he knew conclusively the car wasn't stolen, and he says, and this is at the very end, I think it's on page 59 of the transcript, questions, so the car itself was not contraband at that point? No, because the car wasn't stolen, correct. So he knew, as soon as the VIN was run, and he admits this is the only reason for the stop, the car isn't stolen. Meanwhile, my client and his companion are sitting there on the ground in handcuffs, and instead of letting them go, they wait a few more minutes until, conveniently, the police find contraband. Now, the first piece of contraband is apparently some drugs that is near Mr. Love, who's my client's companion, or was with my client at the time. Then, later, a gun is found in the front seat of the car. It's a different gun than my What does the record show about the amount of time that lapsed before the contraband and the gun? You know, I wish that there had been a better transcript done of the police tapes, because I think that would have shown a proper time index, but what the record does show is it was at least a few minutes, is what Officer Stumpenhaus testifies. So what your honors have to imagine is, at this scene, my client's sitting there in handcuffs, Stumpenhaus gets the report that says the car is not stolen. Instead of saying, oops, my bad, I'm sorry, letting my client and his companion go, they keep them there for at least a few more minutes until something is found. But you would acknowledge, wouldn't you, that if there's additional evidence, such as the contraband or the stolen gun, that the detention can be continued? Oh, without question. I certainly agree with that. But what we have here is a defined, discernible period between the reason for the stop being finished and the discovery of that contraband. And in the Rodriguez case, the Supreme Court said, this is Rodriguez in 2015, the Supreme Court held that as soon as the reason for the stop is allayed, the stop has to end, the detention must end, and anything found after that violates the Fourth Amendment. I see that I'm running low on time. I'd like to reserve the rest, if I could, for rebuttal. Thank you, your honors. Mr. Hurst, you may proceed. Thank you, your honor. May it please the court, Ben Hurst for the United States. I'm going to start with the first issue, but I'm actually going to take one run at the standing question first. I have a couple of cases here. I brought cases that came up. United States v. Gomez in 94, if a defendant fails to prove a sufficiently close connection to the relevant places or objects searched, he has no standing to claim they are illegally searched or seized illegally. This is a car, and in fact, volunteered by defense counsel in the motion to dismiss, or the motion to suppress, I'm sorry, was that the car was owned by Mr. Milton, that Mr. Milton had loaned it to someone else, and that that person had further loaned it to the defendant without knowledge of Mr. Milton. This is a thing that we've mentioned in our brief, that Milton was, in fact, blind to the use of the car by the defendant. And with respect to not having raised this before, Rodriguez, Areola, 270F3611, the government cannot waive Rodriguez's lack of standing, and therefore, any argument based on a waiver must fail. Counsel, if you're referring to any cases that aren't in the briefing, you'll need to submit them through a 28-J letter. Will do, Your Honor. So, I'm not sure, where are we on that understanding issue? What's your position? Our position, Your Honor, is that there's no evidence in the record demonstrating that the defendant had lawful possession of the car. Now, I will say there is evidence in the record that some of the defendant's possessions were found in the car, but there's no evidence in the record, in fact, it was volunteered by counsel for the other side, that the owner of the vehicle didn't know the defendant was using it. Is there any presumptions that if you're driving a car that's not stolen, never been reported stolen, is there any presumption that you're doing it with the consent of the owner? I mean, I guess what I'm getting at is, if we were to go down that route, can we say, well, you didn't approve consent, Mr. Williams, you lose, or do we say, okay, that's an issue that wasn't litigated, we've got to send it back for a hearing? I think, Your Honor, that I would say that the opportunity to put that evidence on, in fact, it's the case that if the defendant testifies at a suppression hearing to establish that kind of thing, that testimony can't later be used against him at trial unless he testifies there. So, I guess what I'm getting at is, there are a lot of issues that could come up at a suppression hearing you don't normally put on evidence unless somebody tells you it's an issue. So, unless the government, even though, well, I don't know. So, you're saying that they have to assume, if you have to prove in every suppression hearing that you either own the vehicle, or call somebody to say you had permission, I don't know. I don't think that's what you normally do in a suppression hearing, is it? And unless the government says, I don't think you were driving with the permission of the owner. I want to point to a case and give you a case on that, Your Honor, and I just, I'm coming up empty on that point. I don't want to misstate what I think, I don't want to misstate what the law is on that, so I just, I don't want to, I'm happy to provide that information to you at a later time, I don't want to misstate it at this point. And just sort of, and not have that prepared for you. Counsel, let's go back to the record then. What does the record show about Mr. Williams' testimony about who owned the car and whether the owner knew that it was being used? Well, Mr. Williams didn't testify at the suppression hearing. The evidence we have about that, in fact, in the record, is what the officers overheard the defendant say when they were there. It was that the car had been provided to him by a female whose name he did not know at a point earlier in time during that day. Now, of course, the officers knew that that wasn't the case because they observed the vehicle drive in there only minutes before. So that statement is a statement I can point you to in the record about the provenance of the vehicle being there. But I think that actually leads me directly into the second point. Well, did they talk to the owner? That information is not in the record, Your Honor. Well, this is what the, in a footnote on page eight of your brief, it says that in his motion to suppress, Williams stated that Milton, the owner, had loaned his car to a third party who allowed Williams to drive it, but that Milton was blind to Williams' use of the car. That's correct, Your Honor. And that was a statement that was made by counsel in the motion to suppress. It wasn't a statement that came out in evidence during the trial or during the suppression hearing. So doesn't that, at least this information tells us that the owner didn't know that the appellant had the vehicle. That's correct, Your Honor. That's what the motion, that's what the footnote of the motion said. So that's all the information that we have about that. That's correct. Other than what the defendant said that I was explaining, in answering Judge Grubb's question. That's, other than that piece, yes, Your Honor. Okay. So what is that? Where are we then if we have a situation as this, as is indicated here, where the true owner doesn't know who's actually driving and in possession of his vehicle. He's loaned it to someone else, and that person authorizes someone else to drive it, but the true owner doesn't have any idea who's driving the vehicle. Yes, Your Honor. Where are we with that situation? I do think that raises a concern about the standing, the expectation of privacy that the defendant has, but I don't, going to Judge Moyes' question, I don't have the case that I want to point you to on that. Well, what about the expired tags? I do think the expired tags. In your brief on page eight, it also says that the vehicle had a temporary tag, and that temporary tag had expired. Yes, Your Honor, and I think that actually goes to both issues in this case. So the first issue about the question of whether they could have stopped him, it's correct that, as my colleague says, that that wasn't what was in his mind, but we all know that what was in his mind doesn't matter. The question is, what would an objectively reasonable officer in that position think? So if they'd seen the tags were expired, I think that would have given him a basis to stop it. But even more so, the question of this space in time that was alluded to earlier, between the time when the VIN report came back that said, well, the car hasn't been reported stolen, and the time when they observed contraband lying on the ground around, which Officer Stumpenhaus testified was a minute, maybe two. That was the actual testimony on that. That time was completely covered by, at the time that the officer learned that the car had not been reported stolen,  so at that point there was a subjective fact that was in his mind that the tags were expired that could have justified the officer doing what I think was reasonable in any case, which was attempting to figure out who of the people who were around the car that had just been driven to that spot was responsible for bringing that car to that location. So it has been suggested here that as soon as the officer learns that the VIN has not been reported stolen, it's like the whistle at the end of the game or Cinderella at midnight. Everybody has to just pack up and leave and not look around as they're doing so. And I think that that, as we suggested in our brief, doesn't account for the situation that the officers are in fact encountering with respect to the duration. So they've said they saw this car pull up next to another car that they knew to be stolen. This is an area where the officer knows that he's recovered stolen vehicles before. And at this point the officer says, yes, the VIN has not been reported stolen, but in fact the officer says that doesn't mean that the car wasn't stolen. It just gives him another piece of information. But it doesn't mean he has to pack up and leave. And in fact at that point he knows that the car has expired tags. And he can go ahead and try to figure out who's responsible for the car being driven unlawfully on the road among those people. And in fact it was elicited by defense counsel. Why didn't you ask the people around who owned the car? And the officer said, yeah, it did. And why did we do that? Well, we were trying to figure out when the car came back with no records on the license plate, the question was, well, whose car is this? And how can we account for its presence here in this place? And I think that question takes them all the way to the point at which they observe the contraband on the ground. They observe the stolen gun in the vehicle and they properly seize it and search it at that point. What's your response to the argument that the stop itself was not reasonable because they mistake the challenger for a charger and that all he had to do was look at the hot sheet that apparently was on a clipboard sitting right next to him? I think there are a couple of issues with that argument, Your Honor. I think that the first one is that we have to recognize that this is extremely low bar. I will maybe push aside the question of if everything had been as the officer believed it to be, was the stop at that point, did he have reasonable suspicion for the stop? He believed the car was stolen. He saw the car stop next to another car. It was a high crime area. At that point, we all agreed if it had been as he believed, there was reasonable suspicion for the stop, I think. But the question is, what about this? Well, he could have just looked and an officer who doesn't look down at his clipboard while he is following an occupied stolen vehicle, a vehicle he believes to be stolen, is unreasonable for having not done that. I think that ignores a couple of things about the situation. First of all, the hot sheet is three, there's three different hot sheets. They cover every stolen vehicle in the Kansas City metro area for the past 30 days. So there are a large number of vehicles listed on the hot sheet that the officer is looking at. Second of all, and much has been made about the officer's statement that he misread the hot sheet, which is in fact exactly what he testified to. And the fact that the hot sheet has only lists on it abbreviations. And the abbreviations are three letters long. So this case, and the officer looks down, at some point looks at the hot sheet and figures out that he believes that there's a red Dodge Challenger stolen. But in fact, what he got right was it was red, it wasn't Dodge, it was a late model vehicle. In fact, the officer observed it to be clean as if it had been stolen from the dealership, which is what he believed to be true. And in fact, the abbreviation for that car is CHL, and the abbreviation for the Charger is CHA. And those abbreviations are only one letter apart. So looking only at the hot sheet question, could an officer reasonably either misread the abbreviations when he's misreading them, or misremember them when he's later informing another officer in the area that there's another stolen vehicle out there? Yes, I think that's a reasonable mistake that can be made. But I think there's an additional two points that need to be put onto that, which is he tells the other officer, hey, I think I saw it was a red Dodge Challenger that was also stolen in this pack of cars from Excelsior Springs. Excuse me. They sit there for an hour and a half, and then the other officer sees the red Dodge Challenger, like, appears out of nowhere, and drives up and stops next to the vehicle that he knows to be a stolen purple Challenger for no reason. In the middle of the street, there's no kids running around, nobody gets in or out of the car. I think that it doesn't, unlike, and I think that my colleague has cited a lot of cases here from other circuits, a lot of them deal with instances where the officer has developed a belief that's mistaken, and then other facts are available to him that put him on notice that he might be wrong. So in Maresca, this is a case where all the people who were stopped in that vehicle said, hey, look, you've got a problem, you've messed it up, re-look at what you're looking at, this isn't the right car. And in fact, on the screen in front of him, or of the officer, could have seen that that information was there, telling him it was a different kind of car. The same thing with the motorcycle case. There was an affirmative finding in that case, that all reasonable officers would know that in Illinois, they issued the same plate number to motorcycles and to cars. So when he put the plate number in, it came back as a stolen motorcycle. That was a mistake. Well, the court said, yeah, but all reasonable officers know that this weird scheme of issuing the same numbers to two different kinds of vehicles is in place. Here, the facts that came out confirmed or corroborated the mistake that the officer had made. So the officer says, I think it's a red Dodge Challenger. Lo and behold, a red Dodge Challenger shows up in an area where he has previously recovered stolen vehicles. He sees it, it stops next to, or his partner sees it, it stops next to a vehicle on the road that he knows to be stolen. So these are factors that corroborate his mistake. I think that to the, and to one other point on that, I think that care has to be taken with a situation where an officer is driving. The government has a different position about what the transcript shows. It clearly shows that he said, I could have called my dispatcher. It definitely, from our position is that he does not say, I could have rechecked my hot sheet. And I think care must be taken in a situation where the officer is moving, following an occupied vehicle he believes to be stolen in a high crime area, to require basically all reasonable officers in that case to look at what the hot sheet says. Again, I don't think that's necessarily required. Does the record show how many pages? You said the hot sheet covers all stolen vehicles for 30 days. Is it a multi-page document? The court asked the government to provide an example of the hot sheet. The example of the hot sheet is multiple pages, which we refer to as Courts Exhibit 1. We don't have the actual hot sheets at issue in the record. So I can't tell the court whether there are multiple pages there. There's one other point that my colleague made that I'd like to respond to, that all these cases aren't somehow just third-party mistake cases. The government has a different read on the law. The government believes that there are, in fact, multiple cases here in this circuit dealing with misperceptions by an officer in the first person. This is Smart, Sparks, Hollins, Flores, Sandoval. All involve the officer's misperception and mistake on his own part. With that, I see my time has expired. Without any additional questions, I'll turn it back over to my colleague. Your Honor, the government must be reading the different record than I have here in front of me. To start with this license plate issue, that's pages 19 and then 29 and 30 of the transcript. Actually, 31 to 32, the license plate wasn't run until the car already had been stopped. So that can't be a reason for stopping the car in the first place either. So we're going back to stopping the car. The issue of the abbreviations on page... The government said that the standard is not a subjective standard. It's an objective standard. I agree. If it were a subjective standard, then the Fourth Amendment would be thrown out the window. I think that's what the Supreme Court says. So you've got a vehicle with expired tags. But it's already been stopped by that point. That's the problem. Well, I'm talking about the original stop. I'm talking about the original stop, yes. So isn't that a valid stop to stop when a vehicle has expired tags? Isn't that a legitimate basis to make a traffic stop? I agree. And if that had been the officer's reason, had they run the tags, found the tags were expired, and then chosen to stop the vehicle, I would agree with you, Your Honor. But that's not what happened here. The vehicle already was stopped. That's the record by the time that happened. That's a red herring, and I think it's interesting the government's bringing that up for the first time in oral argument at this point too. The other issue is this abbreviation thing. Officer... And they ignored this in their brief. On page 21 of the transcript, Officer Palmer clearly says he knew what the abbreviations were that morning because of what had happened with the purple Challenger. So there's that. Finally, this notion about the purple Challenger was there so he had a reasonable belief that the red Challenger was stolen, he only believed the red Challenger was stolen because he hadn't looked back at the hot sheet. If he hadn't thought that was stolen, simply the car stopping next to the car that was already there would not be a reason for stopping it because the Reid case from the Supreme Court in 1980, if behavior is attributable to an innocent traveler equally, then it's not reasonable suspicion for a stop. Your Honors, I would encourage the Court to look through our reply brief and our citations to the record there because they're different than what the government says, and we'd ask  All right. Thank you, Your Honors. Thank you, Counsel. We appreciate your argument this morning. Does that conclude our calendar for this morning? Yes, it does, Judge. It will. The Court will be in recess until further call. Thank you.